# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JOHNNY ROY HALL,** | ) | |
| Plaintiff | ) | Civil Action No. 2:21cv00022 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By:  PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

## *I. Background and Standard of Review*

Plaintiff, Johnny Roy Hall, ("Hall"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew M. Saul as the defendant in this suit.

514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Hall protectively filed applications for DIB and SSI on April 27, 2018, alleging disability as of April 27, 2018, due to diabetes mellitus; heart issues; chest pain; bilateral hand and foot pain and numbness;[2] phantom thumb pain due to amputation; degenerative disc disease of the back; depression; and panic and anxiety. (Record, ("R."), at 12, 218-27, 251.) The claims were denied initially and on reconsideration. (R. at 139-40, 144-45, 148, 150-51, 155.) Hall requested a hearing before an administrative law judge, ("ALJ"). (R. at 158-59.) A hearing was held on November 6, 2020, at which Hall was represented by a nonattorney representative. (R. at 34-66.)

By decision dated November 27, 2020, the ALJ denied Hall's claims. (R. at 12-28.) The ALJ found Hall met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2021. (R. at 14.) The ALJ found Hall had not engaged in substantial gainful activity since April 27, 2018, the alleged onset date.[3] (R. at 14.) The ALJ determined Hall had severe impairments, namely diabetes

---

[2] In a July 24, 2019, Disability Report – Appeal, Hall stated he had undergone surgery on both hands for carpal tunnel syndrome, which had completely alleviated his hand pain. However, the numbness remained due to diabetic neuropathy. (R. at 280.)

[3] The ALJ noted that Hall worked after the alleged disability onset date, but this work did not rise to the level of substantial gainful activity. (R. at 14.)

with peripheral neuropathy; partial left thumb amputation; obesity; residuals of carpal tunnel syndrome surgeries with arthritis of the hands; and degenerative disc disease, but he found Hall did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-20.)

The ALJ found Hall had the residual functional capacity to perform light[4] work, except he could have no exposure to unprotected heights, and he could occasionally crawl, handle, finger and feel. (R. at 20.) The ALJ found Hall was unable to perform any of his past relevant work. (R. at 26.) Based on Hall's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Hall could perform, including the jobs of a furniture rental consultant, a children's attendant and a gate guard. (R. at 27-28, 62-63.) Thus, the ALJ concluded Hall was not under a disability as defined by the Act, and he was not eligible for DIB and SSI benefits. (R. at 28.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2021).

After the ALJ issued his decision, Hall pursued his administrative appeals, (R. at 214-16, 349-55), but the Appeals Council denied his request for review. (R. at 1-5.) Hall then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2021). This case is before this court on Hall's motion for summary

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2021).

judgment filed October 21, 2021, and the Commissioner's motion for summary judgment filed November 19, 2021.

## *II. Facts*

Hall was born in 1968, (R. at 218, 220), which, at the time of the alleged onset date, classified him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). However, only a few months later, he changed age category to a "person closely approaching advanced age" under 20 C.F.R. §§ 404.1563(d), 416.963(d), which he remained at the time of the ALJ's hearing. Hall has a high school education, having obtained his general education development, ("GED"), diploma. (R. at 252.) He has past relevant work as a skidder operator, a shovel-loader operator and a cleaner at a logging company. (R. at 39-40, 61-62.) Hall testified he was fired from this job in 2016 when the entire workforce was let go after a change in management. (R. at 40.) He testified he had insulin-dependent diabetes, for which he took three medications. (R. at 53.) Hall stated his elevated blood sugar levels caused him to break out in a cold sweat, drink lots of fluids due to thirst, use the restroom every 20 to 30 minutes and lose vision. (R. at 53-55.) In 2017, Hall amputated his left thumb with a table saw. (R. at 41.) Thereafter, he started a taxidermy service, but, due to swelling in his hands, he turned the business over to his wife after about four months. (R. at 41.) Hall testified he had tried to work one other job at "a heat pump place," but he only handed tools "and stuff" to his co-worker and ended up in the hospital that night because he thought he was having a heart attack. (R. at 42.) Hall testified he had stinging hand pain every day and night that greatly impacted his sleep. (R. at 44.) He further testified he had hardly any grip in his hands and fingers, and his hands would swell after about five minutes of activity due to neuropathy. (R. at 42.) He said he could not tie his shoes, button his pants, put on a belt, open a piece of

mail or text on a phone. (R. at 44-45.) Although he could write his name, writing for 45 seconds caused his hands to swell. (R. at 45.) According to Hall, a neurologist had told him his hands would only get worse. (R. at 45-46.) He testified he had undergone bilateral carpal tunnel surgery. (R. at 47.) Hall testified he also had neuropathy in his feet, which had caused him to fall several times because his feet would just "go out from under [him]." (R. at 46-47.) Hall said his neurologist had instructed him to use a cane, but he could not use it continuously due to hand swelling and grip issues. (R. at 48.) He testified he took Neurontin and 800 mg ibuprofen, he used a transcutaneous electrical nerve stimulation, ("TENS"), unit, which provided relief for only about 15 minutes, and he tried to do exercises for his pain and neuropathy. (R. at 52-53, 56.) Hall estimated he would be straining to lift five pounds from table height, but he could not lift anything off the floor because he could not bend over. (R. at 55.) He testified he could stand for 10 minutes; he could not walk to and from his mailbox, which was 30 yards from his house, without sitting down; and he could sit for about 15 minutes without interruption. (R. at 55-56.)

Hall testified his pain, depression and anxiety prevented him from working. (R. at 48.) He stated his pain caused panic attacks, difficulty getting along with people, anxiety and agitation. (R. at 48-49.) Hall testified he did not go anywhere alone due to his anxiety, noting his wife provided moral support for him. (R. at 49.) He described some instances of verbal and physical assault that had occurred, including "cuss[ing]" a police officer who ticketed him for an expired sticker at the time of his mother's death, as well as being beaten badly by several men at a party after removing one of the men's arms from around him. (R. at 50-51.) Hall stated he had been receiving mental health services for as much as two years, but he had serious memory problems, so he was not certain how long it had been. (R. at 51-52.) He also could not state what mental health medications he was taking. (R. at 52.)

Hall described his day consisting of moving from the couch, to standing, to sitting on the porch before moving back to the couch. (R. at 56-57.) He testified he had to get rid of his three horses because he no longer could care for them. (R. at 57.)

In rendering his decision, the ALJ reviewed records from Indian Path Medical Center, ("Indian Path"); Blue Ridge Cardiology Group; Ballad Health Medical Associates Diabetes and Endocrinology; Wellmont Health System; Scott County Behavioral Health Services, ("SCBHS"); Associated Orthopaedics of Kingsport; Clinch River Health Services, ("Clinch River"); Dr. Todd Cassel, M.D.; Julie Jennings, Ph.D., a state agency psychologist; Dr. Bert Spetzler, M.D., a state agency physician; Louis Perrott, Ph.D., a state agency psychologist; and Dr. Daniel Camden, M.D., a state agency physician.

*A. Physical Impairments*

The record shows Hall presented to the emergency department at Indian Path on January 3, 2016, for neck, left shoulder and back pain after being involved in a motor vehicle accident. (R. at 583-85, 587, 596.) X-rays of the lumbar spine showed mild degenerative disc space narrowing at the L5-S1 level, and x-rays of the cervical spine showed moderate disc space narrowing at the C6-C7 level. (R. at 578, 580.) Hall was diagnosed with cervical sprain and strain and lumbosacral strain, and he was discharged home. (R. at 600-04.) Hall underwent various diagnostic imaging and testing from February 2016 to March 2018, prior to the relevant time period. Imaging of Hall's cervical spine showed a disc protrusion at the C5-C6 level and a disc bulge at the C6-C7 level, neither with cord or nerve root compression, spurring from the C4-C7 levels with mild to moderate foraminal narrowing, but no spinal cord compression, moderate degenerative disc disease at the C6-C7 level and

progressive osteophyte formation at the C5-C6 level. (R. at 1230-31, 1242, 1244-45, 1258-59.) Lumbar spine imaging over this time revealed mild to moderate arthritic changes at the L4-L5 level, a small extradural defect at the same level with no significant stenosis and only very mild recess narrowing, severe osteoarthritis at this level with foraminal stenosis and no nerve root compression, moderate degenerative changes at this level and only mild spondylosis, a rudimentary L5-S1 disc with fusion of the facet joints, a right spur with foraminal narrowing and questionable L5 nerve root compression. (R. at 1237-38, 1240, 1244, 1257.) In February and March 2016, Dr. Paul Jett, M.D., administered trigger point injections for myofascial pain syndrome; in April and May 2016, he administered diagnostic, bilateral medial branch block injections at the L2-L5 levels; and in June 2016, he administered a couple of radiofrequency lumbar facet injections for long-term symptom relief, as the blocks had provided significant relief. (R. at 1247-50, 1252-53.) Knee x-rays in April 2016 were normal; a chest x-ray in August 2017 was stable with no active findings; and an October 2017 sleep study showed no obstructive sleep apnea. (R. at 1231-35, 1254.)

On March 31, 2017, Hall underwent a left thumb revision amputation surgery by Dr. Jeffrey A. Marchessault, M.D., an orthopedic surgeon, following an accident with a table saw. (R. at 507, 510, 675-79, 869, 894-96, 1349-50.) He was discharged the following day in stable condition to perform activity as tolerated. (R. at 507, 869.) Hall continued to follow up with Dr. Marchessault, and on June 12, 2017, although he complained of some hypersensitivity to the area of the scar when it was struck or rubbed against a firm object, he reported being able to use his hand for activities of daily living and had been able to continue working. (R. at 1333.) Dr. Marchessault diagnosed a superficial neuroma in the left thumb and advised Hall to

cover it with a Band-Aid when performing activities of daily living. (R. at 1333.) He released Hall to return on an as-needed basis. (R. at 1333.)

Hall presented to the emergency department at Indian Path on July 16, 2018, with complaints of chest pain that radiated down the left arm, which started the prior evening while working on a heat pump. (R. at 758, 760, 985, 1009-11.) He reported episodes of dull chest pain with diaphoresis over the previous three weeks. (R. at 985.) Hall's past medical history included, among other things, diabetes; dyslipidemia; gastroesophageal reflux disease, ("GERD"); hypertension; a heart murmur since childhood due to patent foramen ovale;[5] anxiety; depression; restless leg syndrome; and diabetic neuropathy. (R. at 985.) On physical examination, his BMI was 30.21; he was in no acute distress; cardiovascular examination was normal, except for a grade II murmur; he had expiratory wheezes, bilaterally; slightly diminished strength at 4+ in all extremities, but a full range of motion and no erythema or swelling in any joint; cranial nerves were grossly intact; and he had full orientation, an appropriate affect and intact judgment. (R. at 986.) A chest x-ray showed no acute pulmonary process. (R. at 988, 996.) A myocardial perfusion study showed evidence of anterior wall thinning with suggestion of subtle anterior wall ischemia and an ejection fraction of 67 percent. (R. at 984, 1071.) Hall was diagnosed with chest pain and discharged home in stable condition. (R. at 862, 982.) He was continued on medications, including Wellbutrin, BuSpar, Cymbalta and Neurontin. (R. at 771-75.)

---

[5] Patent foramen ovale is a hole in the heart that did not close as it should have after birth. The small flap-like opening is between the right and left upper chambers of the heart. Most people never need treatment for patent foramen ovale. *See* mayoclinic.org/diseases-conditions/patent-foramen-ovale/symptoms-causes/syc-20353487 (last visited Aug. 24, 2022).

Hall was hospitalized at Indian Path on August 6, 2018, for complaints of chest pain and pressure and generalized weakness. (R. at 356, 364, 379-85.) A grade II heart murmur was noted. (R. at 366.) Dr. Robert McQueen, M.D., a cardiologist, recommended a cardiac catheterization, which showed no significant coronary artery disease, normal systolic function and only mild aortic stenosis, and Hall was discharged in stable condition. (R. at 356, 364, 367, 371-72, 982.) Dr. McQueen noted Hall needed aggressive risk factor modification for his uncontrolled diabetes. (R. at 370.) He restricted Hall from bending, squatting, straining and lifting more than 10 pounds for three days, and he continued his medications. (R. at 474-76, 968.)

Hall presented to Ballad Health Medical Associates Diabetes and Endocrinology on October 15, 2018, to establish care for his diabetes, with related symptoms of moderate polydipsia and polyuria, extremity pain, numbness and paresthesia. (R. at 1079.) He reported near constant pain, numbness and tingling in the hands, fingers, feet and toes. (R. at 1080.) On examination, Hall's blood sugar reading was 137; he had normal cardiovascular findings; normal peripheral vascular findings; no extremity edema; a normal gait; normal vibratory perception in both feet; posterior tibial and dorsalis pedis pulses were present in both feet; speech was normal, oriented, appropriate and coherent; and he was alert and fully oriented with an appropriate mood and affect and intact recent and remote memory. (R. at 1080-84.) Hall was diagnosed with type 2 diabetes, uncontrolled, with stable neuropathy, among other things. (R. at 1084.) His A1c goal was placed at less than 6.5, Neurontin and Cymbalta were continued, and Trulicity was prescribed. (R. at 1084.)

On March 15, 2019, an electromyogram, ("EMG"), was suggestive of a moderate carpal tunnel syndrome of the right hand. (R. at 1302-11.) Dr. Joseph Frye, D.O., recommended a surgical referral. (R. at 1302, 1307.) Thereafter, on May 10,

2019, Hall returned to Dr. Marchessault with complaints of carpal tunnel syndrome on the right, including pain and numbness. (R. at 1332.) Physical examination showed a positive Tinel's and a positive Phalen's test, but he could make a full composite fist. (R. at 1332.) Hall reported well-controlled anxiety and depression, and Dr. Marchessault noted he was alert, fully oriented, pleasant and cooperative. (R. at 1332.) Dr. Marchessault diagnosed right carpal tunnel syndrome, for which Hall underwent a release on May 16, 2019. (R. at 1331-32.) On May 24, 2019, he was doing well with no new complaints, and he was released to return as needed. (R. at 1330.) Hall returned to Dr. Marchessault on June 12, 2019, with complaints of left hand and finger numbness, stating he wished to proceed with surgery. (R. at 1328.) Physical examination showed a positive Tinel's and a positive Phalen's test of the left hand, but he could make a full composite fist. (R. at 1328.) Although Hall endorsed anxiety and depression, he stated they both were well-controlled, and Dr. Marchessault observed he was alert, fully oriented, pleasant and cooperative. (R. at 1328.) Dr. Marchessault diagnosed left carpal tunnel syndrome and scheduled Hall for surgery, which he underwent on June 27, 2019. (R. at 1327-28.) Hall's post-operative course was normal, except for some wound healing issues with the right elbow. (R. at 1326.) This issue was resolved with antibiotic treatment and placement of an iodoform wick to allow granulation. (R. at 1325-26.) By July 10, 2019, his finger numbness had resolved, and he could make a composite fist, and by July 26, 2019, Hall reported increased sensation in the left hand and decreased right elbow pain. (R. at 1323, 1326.) Dr. Marchessault referred Hall to a neurologist, as he suspected diabetic polyneuropathy due to some continued finger numbness on both hands. (R. at 1323.)

On July 15, 2019, Dr. Bert Spetzler, M.D., a state agency physician, completed a physical residual functional capacity assessment, finding Hall could lift

and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently push/pull with the left upper extremity; push/pull without limitation with the lower extremities; frequently climb ramps/stairs, balance, stoop, kneel and crouch; occasionally climb ladders/ropes/scaffolds and crawl; and frequently perform fine manipulation with the left hand. (R. at 114-16.) In support of these limitations, Dr. Spetzler noted Hall's left thumb amputation; an ability to make a full fist with both hands following bilateral carpal tunnel surgeries; hand numbness causing difficulty performing activities like tying his shoes, buttoning his shirt and shaving; his use of a cane and brace to move around; back pain due to degenerative changes; and a history of heart catheterization. (R. at 115-16.) Dr. Spetzler opined Hall had no visual, communicative or environmental limitations. (R. at 116.)

On August 23, 2019, when Hall saw Dr. Christopher A. Pendola, M.D., a neurologist, examination showed intact cranial nerves; essentially normal motor strength throughout; normal sensation, except for some decreased vibratory sensation in the hands and feet; and depressed ankle jerks. (R. at 1320-22.) Dr. Pendola indicated Hall was alert, attentive and appropriate with clear sensorium; speech was fluent and clear; mood and affect were normal; he did not appear depressed or anxious; and he did not demonstrate any emotional lability. (R. at 1321.) Dr. Pendola diagnosed diabetic neuropathic pain, and he prescribed a compounded neuropathy gel to use as needed in conjunction with Neurontin and Cymbalta. (R. at 1321.) He advised Hall to keep his blood sugar levels controlled, aiming to keep his A1c below 7. (R. at 1322.) Hall reported his current A1c level was 6.8. (R. at 1320.)

On September 17, 2019, Dr. Daniel Camden, M.D., another state agency physician, completed a physical residual functional capacity assessment in connection with the reconsideration of Hall's claims. (R. at 122-23.) His findings mirrored those of Dr. Spetzler. (R. at 122-23.)

Hall received primary care treatment from Carol Boardwine, F.N.P., a family nurse practitioner at Clinch River, in September and November 2019. Over this time, he complained of some continued elevated blood sugar readings; continued numbness and tingling in the hands; foot pain, which he rated a six on a 10-point scale if walking, but no numbness or tingling; and often feeling tired. (R. at 1479, 1483.) He advised Boardwine of his bilateral carpal tunnel surgeries and that Dr. Pendola diagnosed severe neuropathy in all extremities. (R. at 1483.) On November 1, 2019, Hall also complained of back and left foot pain after falling three weeks previously. (R. at 1479.) Physical examination showed a facial rash and a right hand lesion; normal cardiac findings; wheezing in the upper left lobe of the lung; no extremity edema; and intact peripheral pulses. (R. at 1480-81, 1485.) On September 23, 2019, Hall endorsed worsened anxiety and depression with occasional panic attacks at night twice weekly, forgetting things and mind wandering. (R. at 1483-84.) He stated he had not had suicidal ideations in a while. (R. at 1483.) A depression screening indicated moderately severe depression, but Boardwine observed Hall was alert and oriented at both visits. (R. at 1480, 1483, 1485.) She diagnosed type 2 diabetes; lumbar degenerative disc disease;[6] lumbago with sciatica, bilaterally; left foot injury;[7] joint pain, multiple sites; restless leg syndrome; mixed hyperlipidemia; GERD without esophagitis; anxiety disorder, unspecified; and major depressive

---

[6] Lumbar spine x-rays showed moderate degenerative changes at multiple levels. (R. at 1490.)

[7] Left foot x-rays were negative. (R. at 1489.)

disorder, single episode, unspecified. (R. at 1481, 1485.) Boardwine continued Hall's medications, including Vistaril and Cymbalta, and she increased his insulin dosage. (R. at 1481, 1485-86.) In November 2019, she administered a Norflex/Toradol injection for Hall's back pain. (R. at 1481.)

In March and May 2020, Hall received telehealth treatment from Sutton Hess, F.N.P., a family nurse practitioner at Clinch River. On March 30, 2020, he reported fasting blood sugar levels between 200 and 230; being tired often; bilateral hand numbness, tingling and pain all the time; bilateral foot pain; and hand joint swelling and stiffness, worse in the mornings. (R. at 1473.) At both visits, Hess indicated Hall was pleasant, normal, alert and fully oriented, despite a March 2020 screening indicating moderately severe depression. (R. at 1466, 1473, 1475.) Hall reported medication compliance at both visits. (R. at 1465, 1473.) On March 30, 2020, Hall's blood sugar reading was 183, his A1c level was 7.1, and an antinuclear antibody, ("ANA"), result was positive. (R. at 1476-77.) Hand x-rays were normal. (R. at 1475-76, 1491-92.) By May 5, 2020, Hall reported greatly improved blood sugar levels. (R. at 1465.) Over this time, Hess diagnosed type 2 diabetes with hyperglycemia; bilateral hand pain; GERD without esophagitis; anxiety disorder, unspecified; and major depressive disorder, unspecified. (R. at 1467, 1475.) He continued Hall's medications and encouraged dieting and exercise. (R. at 1467, 1475-76.)

On June 4, 2020, Hall saw Dr. Todd A. Cassel, M.D., at Clinch River, requesting the completion of disability paperwork. (R. at 1461.) He complained of neuropathy in his hands, affecting his sleep, and hand swelling that prevented him from closing them. (R. at 1461.) Dr. Cassel noted that Hall was "completely new to me," and he was "scheduled to fill out his … disability assertion." (R. at 1461.) Dr.

Cassel noted Hall had hand pain and dysfunction, with an old injury to the left hand, symptomatic bilateral wrists and frequent hand numbness, weakness and tingling. (R. at 1461.) However, Dr. Cassel noted Hall did not have the same kind of issues with his lower extremities. (R. at 1461.) On physical examination, Hall was in no acute distress and alert and oriented; he had normal cardiac findings; there was some weakness to hand grip; and there were traumatic changes to the left arm with decreased motion in some of the hand and fingers and slightly decreased sensation; and intact peripheral pulses. (R. at 1462.) Dr. Cassel diagnosed Hall with type 2 diabetes with diabetic neuropathy, unspecified; elevated ANA level; and neuropathy. (R. at 1462.)

On June 8, 2020, Dr. Cassel completed a work-related physical assessment of Hall, finding he could lift/carry up to 10 pounds occasionally and up to five pounds frequently; he could stand/walk a total of one hour in an eight-hour workday, but for 15 minutes without interruption; he could sit for six hours in an eight-hour workday, but for one hour without interruption; he could never climb; he could occasionally stoop, bend at the waist, kneel and balance; crouching and crawling could be performed never to occasionally; his abilities to reach, to handle, to feel and to push/pull were affected by his impairment; and he was restricted from working around heights, moving machinery, temperature extremes and vibration. (R. at 1365-68.) Dr. Cassel opined, to a reasonable degree of medical certainty, these restrictions could have been present since at least March 2017, and, despite his statement that Hall was completely new to him on June 4, 2020, he noted he had experience with Hall. (R. at 1368.) In support of his findings, Dr. Cassel noted Hall's significant neuropathy, his history of median nerve neuropathy, the trauma to his hand with the loss of his thumb and the effect of his neuropathy on both his upper and lower extremities. (R. at 1365-66, 1368.) He stated Hall was unable to feel well with his

hands and had poor grip; his neuropathy affected his safety around heights and machinery; and temperature extremes and vibration aggravated his neuropathy. (R. at 1366, 1368.)

When Hall returned to Dr. Cassel on August 27, 2020, he reported elevated, but asymptomatic, blood sugar levels; pain, numbness and tingling in the hands with some decreased sensation; increased dropping of objects; tight and swollen hands; and mild arthralgias of the leg and shoulder joints, but no new cardiovascular symptoms. (R. at 1455.) On physical examination, Hall was alert and oriented; he had normal cardiac findings; there was no extremity edema; he had slight tenderness through his hands and some to the wrist, but without deformity; there was no effusion or heat in any joint; peripheral pulses were intact; there was no focal weakness; and he had decreased sensation on the great toes and heels. (R. at 1456.) Dr. Cassel diagnosed, among other things, type 2 diabetes without complication; osteoarthritis of the hands; and neck pain. (R. at 1457.) X-rays of both hands were normal, and x-rays of the cervical spine showed small bone spurs at the C5 to C6 level. (R. at 1457, 1493.) Hall's blood sugar was 375, and his A1c level was 9.1. (R. at 1458.) Dr. Cassel continued Hall's medications. (R. at 1459.) The following day, Vickie Ramsey, L.P.N., a licensed practical nurse, provided Hall with education on uncontrolled diabetes. (R. at 1452.) His blood sugar level was 371, and he admitted to poor dietary choices. (R. at 1452.) Ramsey counseled Hall in diet and exercise, and they discussed increasing his insulin. (R. at 1452.) She noted he was very pleasant. (R. at 1452.)

## B. Mental Impairments

Hall received mental health treatment at SCBHS during the relevant time period, including counseling and case management services. In May 2018, Hall

reported his moods were "pretty good" until a neighbor complained to law enforcement he was not caring for his horses. (R. at 1157-58.) He admitted having passive wishes he did not exist, but no active suicidal ideations. (R. at 1157.) Hall's mental status examination was completely normal, including good grooming and hygiene; full orientation; a euthymic mood and congruent affect; appropriate eye contact; clear and normal speech; a normal appetite; and no suicidal or homicidal ideations or hallucinations. (R. at 1158.) He stated he stopped his medication for one day to see how he felt without it, but he had a bad day and realized it was controlling his symptoms. (R. at 1158.) On July 20, 2018, Hall had a GAP insurance screening with Molly Colley, M.A., a resident in counseling after losing his insurance. (R. at 1160.) At that time, he had a depressed mood and congruent affect; he reported passive daily suicidal ideation with no intent or plan; he maintained proper eye contact, and he denied hallucinations. (R. at 1160.) Hall reported, among other things, feeling down and depressed, fatigue, psychomotor agitation, problems with concentration, high anxiety, social isolation, sleep issues, extreme anger, irritability and lack of motivation. (R. at 1160.) Colley found he met the diagnostic criteria for major depressive disorder, recurrent episode, severe. (R. at 1160.) Based on this screening, Hall received a GAP number. (R. at 1160.) That same day, Hall advised his case manager he had been "spreading out" his mental health medications to make them last because he could not afford refills, noting it was working "good" for him when he was taking it as prescribed. (R. at 1161.) On mental status examination, Hall had good grooming and hygiene; alert with full orientation; euthymic mood and congruent affect; appropriate eye contact; clear speech; normal sleep and appetite; and no suicidal or homicidal ideations or hallucinations. (R. at 1161.) In August 2018, Hall reported some relationship issues with his son, but he denied any recent anger outbursts. (R. at 1162.) He reported medication compliance and symptom control. (R. at 1162.) Mental status examination remained completely normal. (R. at

1162.) On September 6, 2018, he reported he had been "doing a lot better" since his insurance issues had been resolved, as he had been able to keep his medication and mental health appointments. (R. at 1163.) Hall also stated he was getting along better with his sons, and he reported having gotten a less strenuous job at a sawmill, which would not require him to work around dangerous equipment, and which was set to begin in about six weeks. (R. at 1163.) He reported medication compliance, and he stated his anger and mood had improved since resuming his medication. (R. at 1163.) In particular, Hall stated, "I didn't realize how good it was until I went without it a few days." (R. at 1163.) Hall's mental status examination, again, was completely normal. (R. at 1163.) On December 26, 2018, when his case manager noted Hall had not been keeping his mental health appointments, Hall advised he wanted to continue coming, as it helped to talk to someone. (R. at 1165.) He also reported continued medication compliance with symptom control. (R. at 1165.) Hall stated he had started his own taxidermy service, which had enabled him to pay his mortgage and a few small bills. (R. at 1165.) However, he said he had his wife sit with him when he did taxidermy because he did not like to be by himself. (R. at 1165.) Mental status examination remained unchanged, and completely normal. (R. at 1165.)

From March 20 through December 16, 2019, Hall received case management and medication management services at SCBHS. (R. at 1166, 1264-70, 1419-50.) Over this time, he expressed health-related concerns; not liking to be alone; quitting taxidermy due to hand pain, difficulty gripping and injury himself several times due to numbness; and his mother's lung cancer diagnosis. (R. at 1166, 1264, 1266.) Despite medication compliance, he reported increased depression, and he stated he felt his medications might need to be increased by his primary care provider, as they "just aren't working" and were not controlling his mental health symptoms. (R. at 1166, 1264, 1268.) Nonetheless, over this time, Hall reported "doing ok" and doing

17

"fair," and his mental status examinations were completely normal, despite his complaints. (R. at 1166, 1264, 1266, 1268.)

On July 15, 2019, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding Hall had no limitations in his ability to understand, remember or apply information; to interact with others; to concentrate, persist or maintain pace; or to adapt or manage himself. (R. at 113.) In support of this opinion, Jennings stated Hall had been doing well on his medications and had shown improvement in his therapy sessions; and recent mental status examinations had shown he was well-groomed, and he had a euthymic mood and congruent affect. (R. at 114.)

Hall underwent a psychiatric evaluation by Celeste Mullins, F.N.P., family nurse practitioner at SCBHS, on August 29, 2019, to begin medication management. (R. at 1445-50.) Hall's wife also was present. (R. at 1445.) He indicated irritability due to poor glycemic control and neuropathy; chronic pain interfered with his daily activities; and he no longer could sustain employment due to chronic health issues and depression/anxiety. (R. at 1445.) Hall stated he felt Cymbalta no longer targeted his mood. (R. at 1445.) On mental status examination, Hall was well-groomed; calm and cooperative; he had good eye contact; his speech was of low volume; he had no suicidal or homicidal ideations; thought process was coherent; mood was sad/depressed, but affect was full; attention/concentration was full; insight and judgment were good; and a musculoskeletal exam was normal. (R. at 1447-48.) Mullins replaced Cymbalta with Trintellix, and she added BuSpar for anxiety. (R. at 1449.) The following day, Hall advised his case manager he had "good days and bad days." (R. at 1444.) His mental status examination remained unchanged and normal.

(R. at 1444.) On September 11 and September 25, 2019, Hall did not show for his case management appointments. (R. at 1441-42.)

On September 12, 2019, Louis Perrott, Ph.D., a state agency psychologist, completed a PRTF in connection with the reconsideration of Hall's claims. (R. at 120-21.) Perrott opined Hall was not limited in his ability to understand, remember or apply information; and to adapt or manage himself; but he was mildly limited in his ability to interact with others; and to concentrate, persist or maintain pace. (R. at 120.) In support of these findings, Perrott noted that, despite diagnoses of anxiety and depression, Hall had normal mental status findings in July and August 2019; he had no history of psychiatric hospitalizations or outpatient mental treatment; and his adaptive functioning appeared to be restricted by pain/physical conditions, not his mental impairments. (R. at 121.) Therefore, Perrott concluded Hall's mental impairments were nonsevere. (R. at 121.)

From September through December 2019, Hall reported irritable mood; anger issues; family members' health issues, as well as his own; still not attempting tasks without his wife's presence; and frustration over this inability to complete tasks due to hand numbness. (R. at 1422, 1434-35.) He reported medication compliance in September and October 2019, noting they helped, but he stated he had discussed increasing his dosages with his provider and that he would like to have them evaluated for efficacy. (R. at 1433-34.) In September 2019, Mullins switched Hall from Trintellix to Viibryd due to an insurance issue. (R. at 1435.) On October 11, 2019, Hall was late for a case management appointment after falling at his home, and he became emotional when describing the incident. (R. at 1433.) He reported a time in the past when he thought the world would be better off without him, and he had thought about using a gun, but he denied current suicidal thoughts. (R. at 1433.)

Mental status examinations were largely normal, with the exception of an anxious mood with variable and intermittent affect on October 11, 2019. (R. at 1433-34, 1437-38.) Mullins continued to diagnose generalized anxiety disorder; and major depressive disorder, recurrent episode, severe, and she increased him medication in September 2019. (R. at 1435, 1438.)

A week later, on October 18, 2019, Hall stated he felt well, but noticed his anxiety caused him to become "short," periodically. (R. at 1430.) He agreed to participate in anger management classes. (R. at 1430.) Mental status examination showed appropriate grooming and dress; good hygiene; he was alert and fully oriented; he had organized thoughts; clear speech; euthymic mood and congruent affect; he interacted well; he had no suicidal or homicidal ideations or hallucinations; and he had good sleep and a normal appetite. (R. at 1430.) On November 21, 2019, Hall requested to switch back to Cymbalta from Viibryd, as he felt it was working well and improved his symptoms better than Viibryd. (R. at 1424.) He reported "not doing too good," as he had "got[ten] beat up" by several men at a party after another man put his hand on him, and he pushed him away. (R. at 1422, 1424.) Hall said he lost a couple of teeth in the altercation. (R. at 1422.) Mental status examination was the same as his prior visit with Mullins, except she deemed his judgment and insight as fair. (R. at 1426-27.) Her diagnoses remained unchanged, and she switched Hall back to Cymbalta. (R. at 1427.) Hall reported continued anger issues, and he was scheduled to begin anger management classes. (R. at 1422.) He reported medication compliance and that Cymbalta seemed to control his symptoms better. (R. at 1422.) Hall stated he still had not been able to complete tasks independently. (R. at 1422.) Mental status examination was normal. (R. at 1422.) On December 3, 2019, Hall failed to attend anger management class, but when he spoke with his case manager on December 16, 2019, he stated he planned to attend the rest of these. (R. at 1419.)

Hall reported compliance with his medications, stating they were working well and controlling his symptoms. (R. at 1419.) Mental status examination remained normal. (R. at 1419.)

Hall received case management and medication management at SCBHS in 2020, and in June 2020, he began individual counseling there. (R. at 1370-1418.) Despite his statement to his case manager that he intended to attend anger management classes, the record shows he attended none, and he was discharged from the program on February 5, 2020. (R. at 1408-09, 1413-14, 1417-18.) On January 29, 2020, Hall's wife informed his case manager that Hall's mother had just passed away, and he was "taking it pretty hard." (R. at 1410.) On February 20, 2020, Hall missed case management and medication management appointments, but he told his case manager by phone he had been "pretty upset" over his mother's death, and he was having difficulty remembering and focusing. (R. at 1406.) Hall reported his medications had been working pretty well, but he was having depression due to his mother's death. (R. at 1406.) Nonetheless, his mental status examination was normal. (R. at 1406.) By February 27, 2020, Hall stated he was "doing alright," "I'm making it right now," "things [were] settling down" after his mother's death, and his anxiety was "coming back down," although it worsened after his mother's death. (R. at 1399, 1405.) He reported an incident with a police officer that "almost got physical" when he was ticketed for expired tags the day after his mother died. (R. at 1405.) By March 18, 2020, he stated he continued to grieve his mother, but was "handling it ok," and he had no needs at that time. (R. at 1398.) On May 20, 2020, Hall advised Mullins he thought his "medicine is doing ok. It's just situational stuff that has me down." (R. at 1396.) The next day, he reported a stable mood and had been trying not to use Vistaril because he felt he did not need it, and it had a sedative effect. (R. at 1390.) Hall reported continued inability to complete tasks without his

wife present. (R. at 1389.) Over this time, he reported compliance with his medications, which were working well and controlling his symptoms. (R. at 1389-90, 1397, 1399, 1405.) On June 4, 2020, he stated he "wouldn't be able to make it without [his medications.]" (R. at 1389.) Hall's mental status examinations remained normal. (R. at 1389, 1392-93 1396-97, 1401-02.) His diagnoses and medications remained unchanged. (R. at 1391, 1394, 1399, 1402.)

On June 26, 2020, Hall saw Michael Lilly, L.P.C., a licensed professional counselor, for intake and counseling. (R. at 1386.) He reported looking for a job because he had been denied disability. (R. at 1386.) Hall stated he felt his memory was so bad, he feared others would "think I have dementia or something." (R. at 1386.) On mental status examination, he was appropriately dressed; initially, he was somewhat ambivalent with the session, but soon warmed up and became very engaged; he was calm and engaged in conversation; attention span and concentration were aligned; he was somewhat somber; he had a euthymic mood and congruent affect; and Lilly easily built rapport with Hall. (R. at 1386.) on July 10, 2020, Hall said his main concern was being behind on his mortgage payment, and he told Lilly he was "struggling a little bit with all the bills and stuff." (R. at 1382-83.) He reported an inability to control his anger at times and having "black outs" when he became angry. (R. at 1382.) Hall stated his wife thought he had a "split personality." (R. at 1382.) He reported continuing to lean on his wife for everything and functioning best with her near. (R. at 1382.) Nonetheless, Hall stated his medications were "working really good right now," noting his symptoms were well-controlled. (R. at 1383.) Mental status examination remained normal, except Lilly noted a depressed mood. (R. at 1382.) On August 4, 2020, Hall reported stress over accusations by his cousin's girlfriend that he was "making moves on her again" and turning people against him. (R. at 1378.) He stated his medications continued to work well and

control his symptoms, and his mental status examination was normal. (R. at 1378.) On August 18, 2020, Hall reported "doing ok," stating he had received assistance with his mortgage payment and power bill. (R. at 1377.) He, again, stated his medications were working well and controlling his symptoms, and his mental status examination remained completely normal. (R. at 1377.) On August 25, 2020, Hall reported "doing good" on his current medications, denying depression, anxiety or mood swings, although he reported some worry the previous few days after his son tested positive for Covid-19. (R. at 1370.) Nonetheless, he stated his medications were controlling his symptoms, and his mental status examination was, again, completely normal. (R. at 1370, 1372-73.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2021). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the

Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Hall argues the ALJ erred by improperly determining his anxiety had become nonsevere since the prior ALJ's decision. (Plaintiff's Memorandum In Support Of Petition For Summary Judgment, ("Plaintiff's Brief") at 3-14.) Hall also argues the ALJ erred in his consideration of the sworn responses to interrogatories provided by his wife. (Plaintiff's Brief at 14-20.) Next, Hall argues the ALJ improperly manipulated the evidentiary record to support his denial of benefits. (Plaintiff's Brief at 20-26.) Lastly, Hall argues the ALJ erred in his consideration of the medical opinion evidence. (Plaintiff's Brief at 26-28.)

Pursuant to the Fourth Circuit's opinion in *Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473 (4th Cir. 1999), and in accordance with Social Security Acquiescence Ruling, ("AR"), 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same … title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 17162 (Jan. 12, 2000).[8] The court notes that, when *Albright* was

---

[8] In considering such a prior finding, the ALJ should consider factors such as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time; (2) the likelihood of such a change, considering the length of time that has elapsed between the previously adjudicated period and the period being adjudicated in the subsequent claim; and (3) the extent

decided, the agency "weighed" opinion evidence under different standards. *See* 56 Fed. Reg. 36932-01, at *36960, 1991 WL 142361(Aug. 1, 1991). Those standards have been superseded by 20 C.F.R. §§ 404.1520c, 416.920c, which prescribe how to consider persuasiveness of opinion evidence and prior administrative findings in claims made on or after March 27, 2017. Because this claim was made after March 27, 2017, the ALJ is required to consider prior ALJ decisions and Appeals Council findings under *Albright*. *See* Program Operations Manual System, ("POMS"), DI 24503.005, available at http://policy.ssa.gov/poms.nsf/lnx/0424503005 (effective Apr. 13, 2021) (explaining the categories of evidence). Here, the ALJ noted he reviewed the prior decision[9] and found, among other things, that Hall's mental impairments had improved since that time. (R. at 25.) Specifically, he stated Hall's anxiety had been well-controlled on medication, and when he noticed his symptoms were worsening, his medication was adjusted, which quickly improved his symptoms. (R. at 25.) Additionally, the ALJ noted Hall consistently had normal mental status at most appointments. (R. at 25.) For these reasons, he concluded Hall's mental impairments had become nonsevere. (R. at 25.) The ALJ need not explicitly discuss each factor in A.R. 00-1(4) in order to comply with it; instead, it must be clear that the ALJ considered the previous determination when evaluating the entire record. *See Kristal N. C. v. Kijakazi*, 2022 WL 1837925, at *8 (E.D. Va. Feb. 22, 2022) (citation omitted); *see also Cuffee v. Berryhill*, 680 F. App'x 156, 159 (4th Cir. 2017) ("[a]n ALJ does not necessarily have to walk through each factor

---

that evidence not considered in the prior final decision provides a basis for making a different finding with respect to the adjudication period of the subsequent claim. *See* A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938.

[9] The previous ALJ found Hall's anxiety was severe and limited him to superficial interaction with co-workers and the public, among other things. (R. at 72, 75.) The ALJ defined "superficial" interaction to include things like providing the time of day or directions about the workplace. (R. at 75.)

in order to comply with AR 00-1(4) …; rather, reviewing and evaluating all the evidence presented at the correct standard complies with the [A.R.]") (quoting *Grant v. Colvin*, 2014 WL 85280, at *7 (E.D. Va. Mar. 4, 2014)). Here, as stated herein, the ALJ considered the prior ALJ's findings that Hall's anxiety was severe, and it limited him to superficial interaction with co-workers and the public. (R. at 72, 75.) However, the ALJ did not find the prior decision persuasive in this regard, explaining that the findings were not supported by the current record, which showed Hall's anxiety had been well-controlled on medication, and when he noticed his symptoms were worsening, his medication was adjusted, which quickly improved his symptoms. (R. at 25.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). During the relevant time period, Hall made numerous reports that his medications were working and that his symptoms were well-controlled. (R. at 1162-63, 1165, 1383, 1389-90, 1396-97, 1399, 1405-06, 1419, 1422, 1424, 1433-34.) Additionally, the ALJ correctly noted Hall consistently had normal mental status findings at most appointments. (R. at 25.) Thus, the ALJ concluded Hall's anxiety no longer was severe. (R. at 25.) The court also notes that, even when Hall was not taking his medication as prescribed, or when he complained it was not working, his mental status examinations continued to be normal or indicated minor findings, such as a depressed, sad or anxious mood/affect and fair judgment and insight. (R. at 1158, 1160-61, 1399, 1401-02, 1405-06, 1426-27, 1433-34, 1437-38, 1447-48.) Furthermore, a review of the record shows that Hall's reports of increased anxiety coincided with various situational stressors, including his mother's lung cancer diagnosis and eventual death, a neighbor's complaint to law enforcement that he was not caring for his horses, losing his health insurance, his own health concerns, having to stop working his taxidermy business due to physical issues and getting into a physical altercation at a party. (R. at 1157-58, 1160, 1166, 1264, 1266, 1406, 1410,

1422, 1424.) In May 2020, Hall even stated his "medicine [was] doing ok. It's just situational stuff has me down." (R. at 1396.)

For all these reasons, I find that the ALJ properly considered the prior ALJ's decision, as it related to Hall's anxiety, under A.R. 00-1(4).

Hall also argues that the ALJ's finding that his anxiety no longer was severe is not supported by substantial evidence. The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. §§ 404.1522(a), 416.922(a) (2021). Basic work-related mental activities include understanding, remembering and carrying out simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. §§ 404.1522(b), 416.922(b) (2021). Although the Social Security regulations do not define the term "significant," this court previously has held that it must give the word its commonly accepted meanings, among which are, "having a meaning" and "deserving to be considered." *Townsend v. Heckler*, 581 F. Supp. 157, 159 (W.D. Va. 1983). In *Townsend*, the court also noted that the antonym of "significant" is "meaningless." 581 F. Supp. at 159.

In evaluating the severity of mental impairments, the ALJ must first determine the degree of functional loss in four areas considered essential to the ability to work: (1) understanding, remembering or applying information; (2) interacting with others; (3) the ability to concentrate, persist or maintain pace; and (4) adapting or managing oneself. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3) (2021). These areas are rated on the following five-point scale: none, mild, moderate, marked and extreme.

*See* 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4) (2021). The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. *See* 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). If a claimant's degree of limitation in all these areas is rated as "none" or "mild," the Commissioner generally will find that the claimant's impairment is not "severe" unless the evidence otherwise indicates that there is more than a minimal limitation in the ability to do basic work activities. *See* 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1) (2021).

Here, the ALJ found Hall had no limitation in the areas of understanding, remembering or applying information and in adapting or managing himself, and he had only mild limitations in the areas of interacting with others and in concentrating, persisting and maintaining pace. (R. at 17-18.) As the ALJ explained in detail in support of these findings, Hall generally did not complain of symptoms related to understanding and remembering, of serious problems going out in public, of problems with interpersonal interactions, of difficulty maintaining concentration, persistence or pace or of problems with adaptation and managing himself; he gave a good medical and mental health history to treating and examining practitioners; he tried working as a taxidermist for months, which would have required concentration and persistence and would have required him to interact with the public, and he quit due to neuropathy in his hands, not due to mental limitations; he exhibited no deficits in memory, insight or judgment; he generally interacted normally with treating practitioners, who often noted he was pleasant, cooperative and in no distress; they observed no deficiencies in eye contact, speech or conversation; at counseling appointments, he had a euthymic mood and congruent affect, normal speech and appropriate eye contact; he went out in public to shop; he socialized with family and friends both inside and outside the home; he lived with family without serious problems; he often reported adequate symptom control from psychiatric

medications; treating practitioners did not observe him to be overly distractible or slow; he reported doing a variety of daily tasks that require some concentration, persistence and pace; treating practitioners generally observed he had no deficiencies in hygiene and was appropriately dressed; there was no evidence he had problems being aware of normal hazards and taking appropriate precautions; he was able to handle the mental demands of parenting; he had no problems with independently making plans and setting goals; when he felt his psychiatric medications were not working well, he had the appropriate insight to request changes, after which he reported benefit therefrom; and he handled his own activities of daily living without significant assistance from others. (R. at 17-18.)

In making his findings as to Hall's mental impairments, the ALJ correctly also noted that Hall's mental status examination findings generally were normal. Even after Hall missed multiple counseling appointments, or, as discussed above, at the occasional appointment when he reported feeling down or anxious, his mental status examination findings, typically, remained normal. The ALJ also noted that, despite an initial increase in anxiety around the time of his mother's death in late January 2020, approximately one month later, he reported his symptoms were "coming back down," and by May 2020, he stated his medications were working well. (R. at 16.) Moreover, as discussed above, Hall continued to have unremarkable mental status findings and appeared to have no functional limitations due to his occasional feelings of anxiety due to stressors. (R. at 16.)

In making his findings as to Hall's mental impairments, the ALJ also noted he found the opinions of the state agency psychologists, who opined he did not have a severe mental impairment, persuasive. Hall argues the ALJ erred in his consideration of this medical opinion evidence. Because Hall filed his applications in April 2018,

20 C.F.R. §§ 404.1520c, 416.920c govern how the ALJ considered the medical opinions.[10] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimant's medical sources. 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2021). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. §§ 404.1520c(b), (c)(1)-(5), 416.920c(b), (c)(1)-(5) (2021) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1) (2021). The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1) (2021). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(2),

---

[10] 20 C.F.R. §§ 404.1520c, 416.920c apply to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

416.920(c)(2) (2021). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[11] *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

The ALJ found the state agency psychologists' opinions persuasive because they have a high level of understanding of the Social Security disability program and because they enjoyed a review of all the available evidence in the record when they rendered their opinions. (R. at 16.) These are acceptable reasons under the regulations. *See* 20 C.F.R. §§ 404.1520c(c)(5), 416.920c(c)(5) ("We will consider other factors that tend to support … a prior administrative medical finding. This includes … evidence showing a medical source has … an understanding of our disability program's policies and evidentiary requirements.") Here, state agency psychologist Jennings rendered her opinion in July 2019, and Perrott rendered his decision in September 2019. (R. at 113-14, 120-21.) That being the case, they had a fair amount of records before them for review. Additionally, as the ALJ stated, the records submitted after they reviewed the case do not show significant objective worsening of Hall's mental health condition. (R. at 16.) In particular, although they do not contain the records from around the time of Hall's mother's death, as discussed herein, his mental status findings during that time were, nonetheless, largely normal. The notes dated subsequent to the state agency psychologists' opinions reflected similar findings to those they had available for review. In

---

[11] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [ ] and consistent with the record [ ] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3) (2021).

particular, the treatment notes not before them showed mostly normal mental status findings and no psychiatric hospitalizations. Furthermore, the ALJ correctly explained how the state agency psychologists' opinions are supported by their summary of and citations to the objective medical evidence of record, including the mental status examination findings and Hall's reports that his routine medication helped his symptoms. (R. at 16.) In particular, Jennings stated Hall had been doing well on his medications and shown improvement in his therapy sessions; and recent medical exams had reflected he was well-groomed, had a euthymic mood and congruent affect. (R. at 114.) Perrott stated that, in July and August 2019, Hall had normal mental status findings, which he specified. (R. at 121.) He further noted Hall had not been psychiatrically hospitalized or undergone outpatient mental health treatment, and his adaptive functioning was restricted by his pain/physical conditions, not his mental impairment, which he deemed nonsevere. (R. at 121.) Lastly, the ALJ correctly explained that the state agency psychologists' opinions are consistent with the totality of the medical evidence of record, which shows Hall almost always had normal mental status examination findings. (R. at 16.) In particular, the ALJ noted that, even when Hall did complain of feeling anxious, the medical evidence did not show that his symptoms affected his functioning. (R. at 16.) It is well-settled that a mere diagnosis of a psychological disorder is not sufficient for purposes of recovering disability benefits; instead, there must be a showing of related functional loss. *See Gross*, 785 F.2d at 1166.

In addition to the reasons explained by the ALJ, the Commissioner also correctly pointed out in her brief that Hall's argument that the ALJ erred in finding his anxiety no longer was severe relies on his subjective reports to his mental health counselors. However, as the Commissioner rightly contends, mere memorialization of subjective complaints in a medical report do not elevate them to the level of

objective findings. *See Fleenor v. Saul*, 2020 WL 808652, at *15 (W.D. Va. Jan. 29, 2020), *report and recommendation adopted*, 2020 WL 806176 (W.D. Va. Feb. 18, 2020) (citing *Craig v. Chater*, 76 F.3d 585, 590 n.2 (4th Cir. 1996)). Similarly, although Hall takes issue with the ALJ's reliance on the multiple findings that Hall had a "euthymic" mood,[12] the Commissioner correctly states that courts have repeatedly found that medical findings of a euthymic mood are a relevant consideration. *See, e.g., Fleenor*, 2020 WL 808652 at *15 (noting that finding such as normal or euthymic mood, good eye contact, clear thought process and good insight and judgment supported the ALJ's mental health findings). Lastly, the court notes that Hall was able to work for months as a taxidermist during the relevant time period, by his own testimony, and he quit this work due to his physical conditions, not any mental impairment or associated symptoms.

For all these reasons, I find substantial evidence supports the ALJ's finding that Hall's anxiety no longer constituted a severe mental impairment, as it resulted in no more than minimal limitations on his work-related abilities.

Next, Hall argues that the ALJ erred by finding not persuasive Dr. Cassel's June 2020 opinion that Hall was limited to less than sedentary[13] work, including,

---

[12] Specifically, Hall first notes that the ALJ never defined the term "euthymic" before he proceeds to argue that such a trait often co-exists in individuals with bipolar disorder. However, there is no evidence in the record that Hall suffers from bipolar disorder. In any event, euthymia is a mood of well-being and tranquility, and even when used to refer to a state in patients with bipolar disorder, it refers to being neither manic nor depressive, but in between, and is associated with adaptive behavior and advanced functioning. *See* dictionary.apa.org/euthymia (last visited Aug. 31, 2022).

[13] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in

among other things, one hour of standing/walking and six hours of sitting in an eight-hour workday, that he either was unable or had an occasional ability to perform postural activities and that he had undefined manipulative limitations. (R. at 24.) In his decision, the ALJ acknowledged Dr. Cassel was a primary care provider who had seen Hall only once before completing his assessment. (R. at 24.) Despite Hall's contention that the ALJ mischaracterized Dr. Cassel's role in his treatment, in his treatment note, Dr. Cassel stated that Hall was "completely new to [him]." (R. at 1461.) Moreover, the ALJ correctly noted Hall saw Dr. Cassel on this occasion for the specific purpose of having disability paperwork completed. (R. at 24.) The ALJ found Dr. Cassel's opinion was not well-supported, in that he explained it by stating Hall had neuropathy affecting his upper and lower extremities. (R. at 24.) It also was not well-supported, as his examination findings do not support the significant limitations he imposed. (R. at 24.) In particular, Dr. Cassel indicated Hall had some weakness of hand grip; decreased motor strength in some parts of the hands and some of the fingers; and slightly decreased sensation, but he had intact peripheral pulses. (R. at 1462.) Additionally, the ALJ found Dr. Cassel's opinion was not consistent with the overall medical evidence. (R. at 24.) For example, although Hall exhibited some diminished sensation in some areas of the foot, he consistently walked with a normal gait, and he had normal strength in the lower extremities. (R. at 24.) Likewise, he had only mildly diminished grip strength and findings in the upper extremities. (R. at 24.) The ALJ concluded that his residual functional capacity finding accommodated Hall by limiting him to only occasional handling, fingering and feeling. (R. at 24.) The ALJ also correctly noted Hall had sought only routine treatment from his primary care providers for his back and neck impairments since the prior decision, and while imaging continued to show mild and moderate

---

carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2021).

degeneration, physical examination findings usually were normal or showed only minor findings, such as tenderness. (R. at 25.)

For all these reasons, I find that the ALJ's consideration of Dr. Cassel's opinion is supported by substantial evidence.

Next, Hall argues the ALJ erred in his consideration of the sworn responses to interrogatories provided by his wife, Shirley Hall, ("Shirley"), as they offer insights into his mental health that are inconsistent with the ALJ's finding that he did not suffer from a severe mental impairment. He also argues the ALJ erred by failing to explain why Shirley's sworn responses have no weight. In his decision, the ALJ correctly stated the interrogatories completed by Shirley do not constitute medical opinions. (R. at 21.) Instead, he stated he was considering them as "other evidence." (R. at 21.) The ALJ acknowledged Shirley's testimony that Hall could not perform a wide range of postural movements; that he could lift only four pounds; that he used a cane; and that he has issues with irritability and anger. (R. at 21.) The ALJ also stated Shirley "alleged that he had to quit working because injuries from a car accident made him unable to do his job, though this is not fully consistent with the claimant's testimony that a new owner terminated everybody who had worked there around 2016." (R. at 21.) Contrary to Hall's argument, under the regulations, the ALJ is not required to articulate how evidence from nonmedical sources was considered. *See* 20 C.F.R. §§ 404.1520c(d), 416.920c(d) (2021). The regulations define a nonmedical source to include family members. *See* 20 C.F.R. §§ 404.1502(e)(4), 416.902(e)(4) (2021). In considering evidence from nonmedical sources, like spouses, it is appropriate for the ALJ to consider certain factors, including whether the evidence is consistent with other evidence and any other factors that tend to support or refute the evidence. *See* S.S.R. 06-03p, 2006 WL

2329939, at *6 (Aug. 9, 2006). In *Gray v. Colvin*, 2014 WL 4660792 (W.D. Va. Sept. 17, 2014), this court found it unnecessary for the ALJ to specifically reference the testimony of the claimant's mother and girlfriend because it was repetitive of the claimant's discredited allegations and inconsistent with other evidence in the medical record. In *Gray*, the court held the ALJ need not undertake the impossible task of mentioning every piece of evidence placed in the administrative record, but he must "articulate his assessment of the evidence to permit meaningful judicial review, which must include specific reference to the evidence producing his conclusion." 2014 WL 4660792, at *8 (citing *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983)). Additionally, the Fourth Circuit has held that it is unnecessary to discuss the testimony of a lay witness where it is inconsistent with other evidence in the record. *See Laws*, 368 F.2d at 644.

Here, like the lay witness testimony in *Gray*, I find that Shirley's statements were repetitive of Hall's discredited subjective complaints and inconsistent with other evidence in the record. Specifically, Shirley's statements contain a reiteration of Hall's allegations that he suffered from anger; anxiety; depression; fatigue; memory difficulty; difficulty sleeping; pain in his back, legs, feet and hands; neuropathy in his hands and feet; swelling of his hands; that he has difficulty with walking, standing, sitting, lifting/carrying, pushing/pulling, gripping objects and using foot pedals; that he needs assistance with buttoning shirts, tying shoes and buckling his belt; and that he uses a cane. Thus, it is cumulative of evidence already contained in the record. Moreover, I find that the severity of such allegations is inconsistent with and contradicted by the record for reasons already stated herein, and which will not be repeated. Moreover, Hall has failed to identify any statute or decision in the Fourth Circuit compelling a contrary conclusion. Although he cites to *Murphy v. Bowen*, 810 F.2d 433 (4th Cir. 1987), for the proposition that the ALJ

is required to explicitly indicate the weight given to all relevant evidence, it goes without saying that the ALJ need not undertake this obligation when it already has been established that he is not required to articulate how evidence from nonmedical sources was considered. Instead, here, he properly articulated his assessment of the evidence in a way to permit meaningful judicial review. For these reasons, I cannot find that the ALJ erred in his consideration of Shirley's statements.

Lastly, Hall argues that the ALJ wrongfully manipulated the record to support a denial of benefits. In particular, Hall raises issues regarding the ALJ's alleged "cherry picking" and misstatements with regard to his anxiety and his work history. With regard to his anxiety, Hall takes issue with the ALJ's emphasis on his increased anxiety around the time of his mother's death. Hall appears to argue that the ALJ should have focused on his aggressive behavior toward a law enforcement officer at that time. As the Commissioner states in her brief, however, the ALJ focused on the salient facts – that Hall had an increase in symptoms corresponding to his mother's death, which improved with further treatment. The mental health treatment notes support the ALJ's findings in this regard. For instance, in late January 2020, Hall's wife informed his case manager that he was taking his mother's death "pretty hard." (R. at 1410.) He missed case management and medication management appointments on February 20, 2020, advising his case manager by phone he had been "pretty upset" over his mother's death and was having trouble remembering and concentrating. (R. at 1406.) A week later, however, he stated he was "doing alright" and "I'm making it now." (R. at 1405.) At that time, he said that, although his anxiety was worse after his mother's death, "things [were] settling down," and his anxiety was "coming back down." (R. at 1399.) Mental status examination at that time was normal. (R. at 1399, 1401-02, 1405.) In March 2020, he reported that, although he continued to grieve the loss of his mother, he was "handling it ok," and

he had no needs at that time, as his medications were controlling his symptoms. (R. at 1398.) Mental status examination, again, was normal. (R. at 1397.) In May 2020, Hall reported he thought his medicine was doing "ok," but "situational stuff" had him down. (R. at 1396.) Again, mental status examination was normal. (R. at 1396.) Later that month, he reported a stable mood and feeling he did not need Vistaril as often. (R. at 1390.) Mental status examination remained normal. (R. at 1392-93.)

With regard to his work history, Hall takes issue with the ALJ's consideration of the reasons he stopped working, as well as his work during the relevant time period. For instance, Hall argues the ALJ erred by finding he stopped working in 2016 for reasons unrelated to his allegedly disabling impairments. The ALJ proceeded to state the evidence showed Hall reported being terminated due to a business decision, suggesting his impairments were not the primary reason his employment ended. Hall further contends the ALJ improperly characterized his taxidermy work as lasting for several months, when he actually performed it for only about four months before quitting due to neuropathy in his hands, rather than due to any mental limitations. However, with regard to Hall's employment the ALJ appropriately considered the evidence, including Hall's admission that he stopped working for reasons unrelated to any medical condition, and while Hall focuses on his subjective complaints of anger, the ALJ properly considered his ability to run a taxidermy business before quitting due to reasons unrelated to his mental health.

As the For these reasons, I find the ALJ reasonably considered the evidence and reasonably supported his rationale for his findings. Hall's arguments appear to be nothing more than an effort to convince the court to reweigh the evidence, which it cannot do on judicial review.

# PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's finding that Hall does not have a severe mental impairment;

2. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Hall was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Hall's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioners decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings

or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    September 6, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE